UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

In re: Search of a Cellular Telephone )   Case No. 1:20-mj-76
Utilizing Telephone Number 423-304-4338 )   Magistrate Judge Lee
Currently in the Possession of )   **FILED UNDER SEAL**
Jeffery Jon Rahn )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, R. Scott Barker being duly sworn, depose and state as follows:

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the seizure and examination of a cellular telephone, which is currently in the possession of Jeffery Jon Rahn, and the extraction from that device of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Knoxville Division, Chattanooga, Tennessee, Resident Agency. I have been employed as a Special Agent for 30 years. Prior to becoming an FBI agent, I was a police officer in Charlotte, North Carolina, for four years. I have investigated a wide array of federal criminal violations, including those related to Civil Rights and Public Corruption. I have received formal training and have participated in numerous search warrants in a variety of investigative matters. As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

Page **1** of **13**

3. The statements contained in this affidavit are based upon my investigation, information provided by other FBI agents, other personnel specially trained in the seizure and analysis of computers and electronic media, and on my experience and training as a Special Agent of the FBI. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of a violation of Title 18, United States Code, Section 242 (Deprivation of Rights Under Color of Law) will be discovered in executing the applied-for warrant.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be seized and searched is a follows:

A cellular telephone, hereinafter the "Device," utilizing telephone number 423-304-4338, currently in the possession of Jeffery Jon Rahn, with service provided by AT&T, specifically as set forth in Attachment A.

5. The applied-for warrant would authorize the forensic examination of the Device.

## PROBABLE CAUSE

6. On June 11, 2019 at approximately 11:00 pm, William Justin Byrum ("Byrum") was arrested by Jeffery Jon Rahn (Rahn), a police officer employed by the Soddy Daisy, Tennessee Police Department ("SDPD"). The arrest occurred on Dallas Hollow Road in Soddy Daisy, Tennessee, which is located in the Eastern District of Tennessee. Byrum was arrested at the rear of his mother's residence, and he was charged with Drag Racing, Felony Evading, and Resisting Arrest.

7. I have interviewed Byrum about his encounter with Rahn. According to Byrum, Rahn approached him, and Rahn ordered Byrum to lay on the ground. Byrum turned away from Rahn, and he went to the ground on his knees. Byrum was in the process of lying flat on the ground when Rahn pushed Byrum to the ground. Rahn handcuffed Byrum's hands behind his back. The handcuffs were very tight on Byrum's wrists. While Byrum was on the ground, he called out to his mother, who was inside the residence.

8. Rahn lifted Byrum off of the ground by his wrists and by the handcuffs in a rough manner. The handcuffs dug into Byrum's wrists, and they began bleeding. Rahn faced Byrum against the back of the house, and Rahn searched Byrum. Byrum turned slightly to the right, and he told Rahn there was a pocket knife in his right front pocket. Byrum continued to call out for his mother. Rahn removed the pocket knife from Byrum's right front pocket, and threw the pocket knife on the ground.

9. Byrum stated he did not struggle with Rahn, he did not attempt to get away from Rahn, and he did not attempt to the get to the back door of his mother's residence.

10. After Rahn removed the knife from Byrum's pocket, Rahn immediately threw Byrum onto the ground. Byrum's left shoulder and side hit the ground. Rahn then struck Byrum two times on the right side of Byrum's face. Rahn picked up Byrum by his wrists and by the handcuffs. Byrum was transported to the SDPD. A security camera located at the residence recorded the arrest, and the recorded footage was consistent with Byrum's recitation of events.

11. Thomas Ray Post, Jr. ("Post") was also arrested on the same date for Drag

Racing, Felony Evading, and Possession of a Firearm While Committing a Felony. Post, who was arrested at a different location, was transported with Byrum to the SDPD.

12. While in the back of Rahn's patrol car – either after arriving at the SDPD or just prior to Byrum and Post being transported to the Hamilton County Jail – Rahn made the statement to Byrum that he got off easy and it could have been worse. Rahn showed Byrum and Post a photograph on Rahn's cell phone. It was a mug shot of a white male with short hair. It appeared to Byrum and Post that the man had been beaten, as he had injuries to his face. Rahn said the man in the photograph had resisted arrest. Rahn also bragged about being a boxer and having boxing "belts" on his mantle at home.

13. The following day, Byrum's mother complained to the SDPD about Rahn using excessive force when he arrested Byrum. She showed a video of the arrest to Captain Marty Bowman and Chief Jeff Gann.

14. On June 12, 2019, Rahn asked SDPD Sergeant Billy Petty to download any video from Rahn's in-car camera regarding the Byrum arrest. Petty asked Rahn if there was body-worn video from the arrest, and Rahn said he had not turned on his body-worn camera. Petty told Rahn that Soddy Daisy City Manager Janice Cagle was going to make examples of officers not turning on their body-worn cameras. Rahn became angry, and he said he had been ordered to go "old school" and "whip people's asses." Rahn also said that he had text messages of what he had been told to do, and that he would suffer no repercussions from the SDPD.

15. On July 7, 2019, Rahn arrested Ethan Vines ("Vines") after a high-speed pursuit

in Hamilton County, Tennessee. Vines stated that after he was in custody, Rahn kicked Vines in the mouth through the open area of the motor cycle helmet Vines was wearing. The kick caused injuries to Vines' face to include the loss of one tooth.

16. SDPD Officer Eric Jenkins ("Jenkins") arrived on the scene after Vines was in custody. Jenkins walked up to Vines, and Vines stated, "please do not kick me in the face again." Vines was wearing a motorcycle helmet, but the helmet was missing the face shield. Jenkins noticed Vines was bleeding from the mouth. One of Vines' top teeth was loose, and the tooth was hanging from the gum. There was a lot of blood in Vines' mouth.

17. Jenkins asked Rahn what had happened, and Jenkins told Rahn what Vines had said about being kicked in the mouth. Rahn responded, "That is what these .45s will do to a bike helmet." Jenkins told Rahn that was "not good." Rahn responded he was good. I am aware that a .45-caliber handgun is generally considered to be a heavy handgun. Based upon my training and experience, a .45-caliber handgun is capable of inflicting serious bodily harm if used as an instrument to strike an individual.

18. SDPD Officer Matthew Thomas ("Thomas") also arrived on the scene of the Vines' arrest. Thomas heard Vines state, "Please don't kick me again." Jenkins told Vines they were not going to kick him. Vines had blood on his lip, and there was blood between his teeth.

19. While on the scene, Rahn began explaining what had happened. Rahn stated, "A H&K .45 will fit perfectly through the wind screen of a motorcycle helmet."

20. Vines was transported, via ambulance, to the hospital. Thomas rode in the back with Vines. Rahn contacted Thomas, and he asked Thomas to photograph Vines' face and send him the photograph. Thomas used his cell phone to take Vines' photograph, and Thomas texted the photograph to Rahn's cell phone. Rahn had a collage of photographs of arrestees on his cell phone. The collage contained photographs of people Rahn had arrested that appeared to have been assaulted. Rahn had sent the collage to other SDPD officers via a group text message. The collage consisted of approximately six photographs of individuals that had been arrested. Each person in the collage had injuries to their faces.

21. On August 15, 2019, Petty and Rahn encountered each other again. Immediately after FBI and local law enforcement spoke with SDPD Chief Gann about excessive force allegations against Rahn, Petty saw Rahn in the parking lot. It was apparent to Petty that Rahn wanted to speak with him, but he left before Rahn had the opportunity to do so. The following day, while Petty was at a gas station, Rahn saw him and pulled his car around to speak. Petty suggested that the SDPD administration would not support Rahn and that Rahn should protect himself. In response, Rahn said that he had done nothing wrong in subduing Byrum and that he had a "basket" to protect himself from SDPD administration. Petty understood this "basket" to refer to information and text messages pertaining to the allegations of excessive force.

22. On June 14, 2020, the attorney for a cooperating source ("CS") sent me a screenshot of a partial text-message conversation that included Rahn, Thomas, Jenkins, and Penny, among others. I know the CS to be reliable, in that s/he has

Page 6 of 13

Case 1:20-mj-00076-SKL   Document 4   Filed 08/22/20   Page 6 of 16   PageID #: 9

provided information about this investigation in the past that has proven reliable and that I have verified by other means. The captured text-message conversation was dated Monday, May 11. In 2020, May 11 occurred on a Monday. In the conversation, a participant labeled "Jeff Rahn Soddy Daisy PD" stated: "Boys, I'm really thinking and praying hard about quitting. I still haven't heard the first word about this investigation I just don't know how much more of this crap I can take and it's definitely not worth the stress that it's put on me and my family. Whatever happens I love you guys, I appreciate you having my back, and it's been a pleasure serving with you."

23. On June 15, 2020, the attorney for a different CS sent me a screenshot of an "iMessage" conversation purporting to be between Rann and Jed Krider ("Krider"), another SDPD officer. I know the CS to be reliable, in that s/he has provided information about this investigation in the past that has proven reliable and that I have verified by other means. iMessage is a proprietary instant-messaging platform developed by Apple for use on Apple devices, including iPhones. According to the attorney, the CS came into possession of the screenshot on June 13, 2020. The screenshot is appended here:



24. Witnesses including Billy Petty have advised that Rahn began his employment with SDPD in or around July 2017. Petty recalled that Rahn began his employment with SDPD at approximately the same time that Petty became the first-shift patrol sergeant, which was in July 2017. Accordingly, this Affidavit and attendant Application request seizure of information and records relating to violations of Title 18, United States Code, Section 242 by SDPD Officer Jeffery Jon Rahn from July 1, 2017, to the present.

25. Based on my training and experience, and the facts described herein, I believe that Rahn's cellular phone will contain evidence, including text messages and images, pertaining to the use of excessive force by himself and SDPD. There is probable cause to believe that a search of his cellular phone will produce such evidence.

Page **8** of **13**

As described below, electronic devices can and do store information for long periods of time. Further, Rahn's statements indicate that he deliberately retains text messages and other information as a potential form of leverage in the event he perceived SDPD's interests may become adverse to his own.

## TECHNICAL TERMS

26. Based on my training and experience, I use the following technical terms to convey the following meanings:

Wireless or cellular telephone: A wireless telephone (or mobile telephone, or cellular telephone, or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). In the laptops, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file

systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to

be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. Because this search warrant relates to an ongoing investigation and details information not known to targets and subjects, its publication could frustrate the investigation and cause targets to change patterns of behavior, attempt to intimidate witnesses, and destroy evidence. Accordingly, I request that the applied-for warrant and all attendant filings, including this affidavit, be filed and maintained under seal.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of each Device described in Attachment A to seek the items described in Attachment B.

FURTHER AFFIANT SAYETH NAUGHT.

_____
R. Scott Barker,
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this 22 day of June, 2020.

_____
Hon. Susan K. Lee,
United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

In re: Search of a Cellular Telephone )   Case No. 1:20-mj – 76
Utilizing Telephone Number 423-304-4338 )   Magistrate Judge Lee
Currently in the Possession of ) **FILED UNDER SEAL**
Jeffery Jon Rahn )

## ATTACHMENT A

The property to be searched is the cellular telephone or device associated with cellular telephone number (423)304-4338, in the possession of, or under the custody and control of, Jeffery Rahn.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

In re: Search of a Cellular Telephone )  Case No. 1:20-mj - 76
Utilizing Telephone Number 423-304-4338 )  Magistrate Judge Lee
Currently in the Possession of )  **FILED UNDER SEAL**
Jeffery Jon Rahn )

## ATTACHMENT B

Items to be searched for and seized pursuant to the search warrant:

1. The Device described in Attachment A, and all records thereon that relate to violations of Title 18, United States Code, Section 242 by SDPD Officer Jeffery Jon Rahn from July 1, 2017, to the present, including:

   a. call logs, text messages, instant messages, contact/address lists; e-mails, social media messaging (i.e. Facebook messenger), messages sent o,r received from communication applications or software programs such as WhatsApp.

   b. saved audio or video clips from communication applications or software programs (i.e. Facebook messenger, WhatsApp)

   c. communications and information relative to law enforcement actions, interactions with subjects, interactions with confidential informants, and interactions with other law enforcement personnel;

1 of 2

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address, including:

   a. records of Internet Protocol addresses used;

   b. records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.